United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 27, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-20201** |
| **HERITAGE HOTELS** | § | |
| **ROCKPORT LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HERITAGE HOTELS** | § | |
| **ROCKPORT LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 24-2007** |
| | § | |
| **JON K TAKATA,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

This dispute arises from contracts governing mitigation and reconstruction work of a hotel in Rockport, Texas. Heritage Hotels Rockport LLC (owner) brings breach of contract claims against Jon K. Takata Corporation d/b/a Restoration Management Company ("RMC") (general contractor). RMC counterclaims seeking to recover the balance of its unpaid invoices.

The Court heard witness testimonies and closing arguments over three days. This opinion consists of the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds that:

- RMC's labor and mobilization charges were proper under the Emergency Services Agreement.

1 / 22

- RMC is owed $439,895.66 under the Emergency Services Agreement.

- Heritage properly terminated the T&M Contract for cause.

- Heritage is owed $138,022.11 under the T&M Contract.

- Heritage is the prevailing party under the T&M Contract.

- Heritage is awarded reasonable and necessary attorney's fees under the T&M Contract, with the amount subject to proof at an evidentiary hearing.

## FACTUAL BACKGROUND

On August 25, 2017, Hurricane Harvey struck Rockport, Texas, severely damaging the Lighthouse Inn. ECF No. 40 at 34. To reopen in time for peak season (before Memorial Day weekend), Heritage hired RMC to perform water mitigation work and to reconstruct the Lighthouse Inn like-for-like. ECF No. 40 at 38.

RMC is a nationwide general contractor, whose business primarily consists of restoration and mitigation work. Reconstruction work is a much smaller part of its customary business. The water mitigation and reconstruction were governed by two separate contracts, both drafted by RMC.

## I.   WATER MITIGATION WORK

The water mitigation work was governed by the Emergency Services Agreement ("ESA") dated September 14, 2017. ECF No. 17-1. RMC completed its mitigation work under the ESA in late October. ECF No. 40 at 42. Heritage had no issues with RMC's performance. ECF No. 40 at 42.

With respect to billing under the ESA, RMC first submitted invoice summaries with supporting information to Heritage and its

insurer, StateAuto, for review and approval.  ECF No. 40 at 43.  RMC then invoiced Heritage based on the release of insurance proceeds by StateAuto.

- On November 20, 2017, Heritage was invoiced in the amount of $1,000,000.00.  ECF No. 36-2 at 4.

- On November 30, 2017, Heritage was invoiced in amount of $200,000.00.  ECF No. 36-2 at 5.

-  On December 14, 2017, Heritage was invoiced in the amount of $547,564.44.  ECF No. 36-2 at 6.

- On February 22, 2018, Heritage was invoiced in the amount of $820,544.67.  ECF No. 36-2 at 7.

- On June 30, 2018, Heritage was invoiced in the amount of $459,592.12.  ECF No. 36-2 at 8.

RMC billed Heritage a total of $3,027,701.23 for mitigation work. Heritage paid four of five invoices.   The final invoice, in the amount of $459,592.12, remains unpaid and outstanding.  RMC credited Heritage in the amount of $19,696.46 for supply overcharges.  ECF No. 16-40 at 7.  The net amount unpaid by Heritage under the ESA is $439,895.66. ECF No. 24.  Heritage withheld payment due to a dispute over charges made under the ESA.

## II.  RECONSTRUCTION WORK

In November 2017, the parties entered into the second contract, the Time & Materials Agreement ("T&M Contract"), for the reconstruction of the Lighthouse Inn.  The reconstruction was initially intended to reconstruct the hotel to its original design.  The parties refer to this as a "like-for-like" reconstruction.  ECF Nos. 13-7, 40 at 51, 55. The targeted approximate substantial completion date was May 23, 2018.   ECF No. 13-7.   This date was "subject to timely materials selections, materials availability, and any building permit issuance." ECF No. 13-7.  The contract price was not to exceed $4 million subject to change orders.  ECF No. 13-7.

To assist with the management of the reconstruction, Heritage hired Architect Andre Landon. ECF No. 40 at 55. Landon was responsible for overseeing the project, approving or disapproving change orders, and certifying the payment of invoices submitted by RMC. ECF No. 40 at 56.

RMC started reconstruction efforts in mid-November 2017. By the targeted substantial completion date of May 23, 2018, reconstruction was far from complete. In July 2018, Heritage terminated RMC alleging the termination was "for cause". ECF No. 17-41. Later that month, Heritage retained a different contractor to complete the reconstruction. ECF No. 40 at 99. In January 2019, the hotel opened 26 rooms. Most rooms in the hotel opened in August 2019. ECF No. 40 at 99.

Under the T&M Contract, RMC sent seven invoices to Heritage, totaling $3,385,029.70. ECF No. 36-1 at 6. Heritage paid $1,679,531.12. Four invoices remain unpaid in the total amount of $1,705,498.58. ECF No. 36-1 at 6.

## JURISDICTION

28 U.S.C. § 1334 provides the District Courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). This proceeding has been referred to the Bankruptcy Court under General Order 2012-6. The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486−87 (2011). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

**DISCUSSION**

## I.    RMC PROPERLY BILLED LABOR FOR MITIGATION WORK UNDER THE ESA

The ESA sets billing regimes for labor.  Heritage argues that RMC improperly billed labor at a higher rate than provided by the ESA.

A Schedule of Fees' price list (incorporated into the contract) provides hourly rates for different categories of workers.[1]  "General Labor" was billable at $36.00 per hour.  ECF No. 17-1 at 3. Below the price list, it provides: "Subcontractors and equipment rented from others will be billed at cost plus 20%." ECF No. 17-1 at 3.  A substantial portion of RMC's mitigation work was performed by laborers from third-party labor suppliers.

Heritage asserts that these third-party laborers should have been classified as "Subcontractors."  If treated as subcontractors, the total labor charge would be substantially less than if treated as general labor. RMC maintains that the third-party laborers were correctly classified as "General Labor" under the price list for hourly labor.  The parties did not define the term "Subcontractor."  The contract does not distinguish between third-party laborers who are direct employees, those who work for companies who provide day labor, and those who work for a traditional subcontractor.

In construing a written contract, the Court's main duty is to ascertain the parties' intent expressed within the four corners of the document.  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  The Court must harmonize the entire instrument by considering every provision.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  A term in a contract is ambiguous if its meaning is susceptible to

---

[1] The price list provides rates for: Senior Project Manager, Project Manager, Operations Manager, Health/ Safety Office, Electronics/Equipment Supervisor, Electronics/Equipment Technician, Environmental Supervisor, Environmental Technician, HVAC Supervisor, HVAC Technician, Restoration Supervisor, Restoration Technician, Project Auditor, Cleaning Technician, Skilled Labor, General Labor, and Management of Customer Labor Force.  ECF No. 17-1 at 3.

more than one reasonable interpretation. *Nat'l Union*, 907 S.W.2d at 520. If a contract is ambiguous, the court may consider extraneous evidence to ascertain the true meaning of the contract. *Id.*

Ambiguity is either patent or latent. *Id.* Patent ambiguity is apparent on the face of the contract. *Id.* "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.*

The Court finds, as a matter of law, the term "Subcontractor" is latently ambiguous. The term does not appear ambiguous on its face, but when applying the "Subcontractor" language to the particular facts and claims in this case, the term is susceptible to more than one construction. The plain meaning of "Subcontractor" is "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor." BLACK'S LAW DICTIONARY (12th ed. 2024). The Fifth Circuit has defined a subcontractor as "one who takes a portion of a contract from the principal contractor or another contractor." *Avondale Indus., Inv. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 494 (5th Cir. 1994).

> In other words, under the plain and ordinary meaning of the term, a subcontractor relationship exists when Party A (principal party) contracts with Party B (contractor) for certain work, and in turn, Party B (contractor) contracts with Party C (subcontractor) to perform a portion of the work for which Party A contracted with Party B.

*MDC Energy, LLC v. Crosby Energy Servs. Inc.*, No. 4:22-CV-03175, 2024 WL 4329028, *5 (S.D. Tex. Aug. 16, 2024). RMC is a general contractor. "Subcontractor" could include all third-party laborers hired by RMC through a labor service provider as Heritage contends; or "Subcontractors" could comprise only certain third-party laborers under no direct supervision by RMC and not provided in the price list, as RMC contends. Both interpretations appear reasonable. Because latent ambiguity exists, the Court considers extrinsic evidence.

Heritage seeks to define the nature of the billing distinction not by interpreting the contractual terms but by resorting to a common-law test for employee-subcontractor status. The Court is unpersuaded by Heritage's position. The Court's primary duty is to respect the parties' bargain, not supplant a term of a contract with a common law meaning just because the term has common law significance. *See TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston 2018) ("Sometimes contracts include terms that have common law significance. A term's common-law meaning will not override the definition given to a contractual term by the contracting parties."). Further, the *Limestone* five-factor test[2] for determining whether a worker is an employee or an independent contractor is inapposite here. That test is used for the purpose of determining liability in worker compensation cases. *Limestone*, 71 S.W.3d at 312. The Court declines to import the test into this contract dispute.

Dan Pinder, a regional director at RMC, testified on behalf of RMC regarding its emergency mitigation operations. For emergency mitigation work, like the mitigation work here, Pinder testified that RMC regularly employs its own staff for managerial and supervisory roles billed at a higher hourly rate than at the rate for "General Labor." ECF No. 42 at 198. Pinder testified that RMC does not have general laborers on its staff, and its operations team typically sources general laborers from a labor supplier company with a local office near the mitigation site. ECF No. 42 at 198. Specifically, RMC hired Sterling Personnel, Inc., peopleready, and LaborMax Staffing for mitigation work. ECF Nos. 16-58, 16-59, 16-60. Pinder testified that most of the workers from those companies fell under "General Labor." Those workers were integrated into RMC's staff, were trained by RMC staff,

---

[2] To determine whether a worker is an employee or independent contractor in workers compensation cases, Texas courts look at the following factors: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002).

and performed general labor under RMC's direct supervision and control. ECF No. 42 at 201–02. Pinder's testimony supports the reading that "General Labor" may be performed by laborers sourced through labor suppliers and does not need to be exclusively performed by RMC's own employees. Nothing in the price list explicitly excludes third party laborers from being billed an hourly rate.

RMC also points to the parties' course of performance to show that Heritage is estopped from bringing its breach of contract claim because it approved and paid the invoices. "Course of performance refers to a sequence of conduct between the parties to a particular transaction that takes place during the performance of the contract at issue, meaning that a course of performance occurs after contract formation." *See Proton PRC, Ltd. v. ET & AS Inv., Inc.*, No. 02-21-00258-CV, 2022 WL 488939, at *5 (Tex. App.—Fort Worth Feb. 17, 2022). Courts may consider course of performance evidence in interpreting ambiguity in a contract. *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 403 n.9 (5th Cir. 2006).

The Court gives this evidence limited weight. Although RMC submitted invoice summaries identifying most mitigation labor as "General Labor," those summaries did not disclose that the workers were sourced from third-party labor suppliers. Heritage therefore did not knowingly acquiesce in RMC's classification of labor.

Ultimately, the structure of the ESA supports RMC's interpretation. Under Texas law, specific contractual provisions prevail over general ones. *In re Davis Offshore, L.P.*, 644 F.3d 259, 266 (5th Cir. 2011). Here, the Schedule contains a detailed price list enumerating hourly labor categories applicable to mitigation work, including "General labor" with fixed hourly rates. The subcontractor provision is general and does not specify whether labor that fits within the price list is excluded from "Subcontractor" billing merely because it was performed by third parties. Reading the price list to exclude third party sourced laborers is unsupported by the plain language and would render the price list to be mere surplusage to the bulk of the contract.

The Court also considers the economic realities.  Heritage should be indifferent to the sourcing of General Labor.  Heritage indisputably agreed to pay $36.00 per hour for General Labor if the General Laborers were RMC employees.  The Court does not understand why Heritage anticipated paying different hourly labor rates depending on the sourcing of the laborer.  It should be economically indifferent.

The invoice summary also provides that a "Framer" billed eleven hours at $62.87 per hour during week three of mitigation work.  ECF No. 13-3 at 17.  "Framer" is not an enumerated category under the price list.  But the absence of a term does not make it ambiguous.  The ESA Schedule of Fees provides:

> This Schedule of Fees reflects the most commonly used labor categories, equipment and materials on typical projects.  Due to the unique nature of our work, to meet project specific needs RMC may add additional labor categories, equipment or materials to this schedule of fees at rates to be determined by RMC.

ECF No. 17-1 at 3. Based on the plain language of the Schedule, the price list is illustrative, not exhaustive.  Nothing in the ESA requires that every labor classification be expressly enumerated in advance nor does the contract provide that unlisted labor must be treated as subcontractor work subject to cost-plus billing.

Further, Heritage is estopped from claiming that the framer should be charged at actual cost plus markup as a "Subcontractor."  The framer category, corresponding hourly rate, and hours worked were disclosed in the invoice summary, which was reviewed by Heritage. Although the invoice summary did not disclose that the framer was from a labor supply company, Heritage agreed to pay for a framer at $62.87 per hour.  Heritage did not challenge the framer rate during performance.

Heritage has not shown, by a preponderance of the evidence, that RMC's billing of third-party labor at hourly rates under the price list

breached the contract.  Heritage's breach of contract claim for improper billing of mitigation labor fails as a matter of law.

Heritage separately claims that RMC overbilled for mobilization work and seeks an offset of $151,971.87.  ECF No. 40 at 16.  Heritage hired Michael Eddings, a senior vice president at a construction consulting firm, to review the invoice summary for mobilization work.  ECF No. 40 at 220, 223.  The invoice summary provided for a total of $312,487.91.  ECF No. 17-37.  Eddings testified that mobilization rates were not identified in the ESA and that $160,516.04 is the actual fair and reasonable charge for mobilization.

Eddings was unaware that the invoice summary provided to him included mobilization charges for multiple mitigation projects in Texas.  Heritage was charged only 38% of the total amount.  ECF No. 36-1 at 307. That charge was only  $127,743.62.  ECF No. 14-18.

The Court finds that the reasonable mobilization charge allocable to Heritage is $127,743.62.   That is the precise amount that was charged.

## II.   Heritage's Termination of the T&M Contract Was Proper

The reconstruction work was governed by the T&M Contract and the parties stipulate that Texas law applies.[3]  ECF No. 10 at 8.  Heritage argues that RMC's alleged breaches justified its termination of cause.

To justify termination for cause, the breaching party must be given (1) adequate notice of its breaches deemed material, and (2) a reasonable opportunity to cure unexcused breaches.   7 Bruner & O'Connor on Constr. Law § 18.4 (2026).

---

[3] The T&M Contract provides that California law applies to this dispute.  ECF No. 17-2 at 4.  The Contract was drafted by RMC, a California entity.  However, both parties waive the choice of law clause in their joint pretrial statement by agreeing that Texas law applies.  The hotel is in Texas and Texas bears a substantial relationship to the dispute. Texas law applies.

On June 1, 2018, one week after the stated substantial completion date, Heritage provided RMC written notice identifying performance deficiencies that were causing delay.  ECF No. 17-40.  On July 5, 2018, Heritage terminated the T&M Contract.  ECF No. 17-41.

The critical inquiry is whether RMC's alleged breaches are material.  When one party to a contract commits a material breach of contract, the other party is discharged or excused from further performance.  *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004).  Materiality is a question of fact, evaluated from the facts and circumstances shown in evidence.  *Mustang*, 134 S.W.3d at 195.  There is no bright-line rule to determine materiality, courts must "weigh the purposes to be served, the desire to be gratified, the excuse for deviation from the letter, the cruelty of enforced adherence."  *Jacobs & Youngs v. Kent*, 230 N.Y. 239, 243–44 (N.Y. 1921) (J., Cardozo).  Courts regularly consider the following factors set forth in the Restatements (Second) of Contracts:

1. The extent to which the injured party will be deprived of the benefit which he reasonably expected;

2. The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

3. The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

5. The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS § 241 (2024).  In the construction context, a material breach "goes to the heart of the contract" and "defeat[s] the very object of the contract."  7 BRUNER & O'CONNOR § 18.1.

The cumulative effect of RMC's conduct justifies Heritage's termination for cause.

Heritage alleges that RMC failed to prosecute the work in a timely manner. ECF No. 17-41. The T&M Contract sets an approximate substantial completion date of May 23, 2018, subject to timely materials selections, materials availability and any building permit issuance. ECF No. 17-2 at 1. It is not a "time is of the essence" provision, which is common in construction contracts. When "time is of the essence" and the contractor fails to meet the completion deadline, material breach is presumed. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). But even in the absence of a "time is of the essence" clause, the contractor must make reasonable efforts to meet the completion date. *See Wright v. King*, 292 S.W. 602 (Tex. Civ. App.— Dallas 1927, *writ ref'd*). This obligation carries great weight here, as both parties understood that reopening before the summer peak season was commercially important for Heritage.

The hotel did not partially reopen until January 2019, and most of the hotel did not reopen until August 2019. That was 15 months post contractual completion date. The 15 month delay is monumental when compared to an expected completion date that was only 6 months past the original contract's execution date. Although the delay was the product of multiple factors, the record establishes that RMC's deficient management was the most significant contributing cause of the protracted completion date.

The T&M Contract did not expressly require a construction schedule and RMC did not provide one at the time of the contract. Nevertheless, a contractor's preparation of a construction schedule at the inception is customary and expected. Under Texas law, when a contract is silent on a term, the customs and usage universal in the industry are implied into the contract by reference if it does not alter or vary the terms of the contract. *See Carrizo Oil & Gas, Inc. v. Barrow– Shaver Res. Co.*, 516 S.W.3d 89, 99–100 (Tex. App.—Tyler 2017). Heritage presented evidence of custom and usage through its Architect,

Andre Landon.  Landon has been practicing architecture for 45 years and has significant experience in reconstruction projects like the one here.  ECF No. 42 at 6–7.  Landon testified that it is "very common" for commercial projects to have a construction schedule prepared by the contractor and he has "rarely" seen projects at any scale proceed without one.  ECF No. 42 at 7.  A construction schedule helps the "architects and engineers to be able to schedule their work, and understand when the shop drawings and submittals would be coming into the project . . . so that [Heritage] can schedule [its] time accordingly."  ECF No. 42 at 7–8.  It also helps Heritage select materials by a certain date.  ECF No. 40 at 59.  The Court finds that, in this context, preparation of a construction schedule was an integral component of RMC's performance obligations.

Heritage did not receive a construction schedule from RMC until mid-March 2018, four months after reconstruction commenced, and only two months before the estimated completion date.  ECF No. 42 at 60.  When finally produced, the schedule projected 100 percent completion on June 24, 2018, a month beyond the stated completion date and only 3 months after the schedule was produced.  ECF No. 40 at 62.  RMC represented to Heritage in April 2018, a month before targeted substantial completion, that it was only 46 percent complete with the project.  The record is devoid of any agreement between the parties for an extension of time.

RMC's explanation for the delay is unavailing.  RMC contends that it could not prepare a schedule until Heritage provided final plans and specifications.  On March 1, 2018, RMC emailed Heritage: "Given that we just received structural and architectural plans on this project TODAY . . . we are still compiling our project schedule."  ECF No. 14-18 at 1.  RMC's position is unpersuasive.  The general scope of the project was to reconstruct the Lighthouse Inn "like- for-like".  Existing plans and specifications of the hotel's original design were available to the parties at the time of contract execution.  ECF No. 42 at 11.  Architect Landon testified that RMC was provided with those plans from the outset.  ECF No. 40 at 63.  The fact that certain plans were subject to

municipal approval or later redesigns does not excuse the absence of an initial schedule. It is "standard operating procedure" to develop a construction schedule even where approvals remain pending. *See* ECF No. 40 at 63.

To be clear, not all delays are attributable solely to RMC. Architect Landon, testified that the start and finish dates under the T&M Contract "don't seem reasonable" and that "these things take a little bit longer than anybody seems to think." ECF No. 42 at 113, 115. He further testified that after RMC was terminated, "there were issues that were found just by the nature of being an existing building that no one could know until being exposed. So there was a lot of additional work that would have had to have been done. Or there was some additional work that would have had to have been done that nobody could have known . . . ." ECF No. 42 at 113.

These realities are, to an extent, inherent in every construction endeavor on an existing structure. However, these reasons do not absolve RMC's obligation to provide a framework to prosecute work diligently. On the contrary, they underscore the importance of a construction schedule at the outset.

Under Texas law, it is the contractor's burden to prove that delay was caused by the owner to avoid liability for missing the completion date. *ISI Contracting, Inc. v. Metro. Transit Auth. of Harris Cnty.*, 720 S.W.3d 767, 787 (Tex. App.—Houston 2025). Here, although the record reflects instances of owner-driven changes and delayed plan approvals, RMC failed to establish a baseline construction schedule from which delay could be measured or allocated. "When disputes arise on construction projects, the existence and quality of the scheduling data become critical to the ability of the owner, contractor, or subcontractor to make its case for delays and impacts thereof." CANTERBURY & GASWIRTH, TX CONSTR. L. MANUAL § 8:17 (3d ed., 2025). Without a schedule in place during the first four months, a contractor cannot rely on alleged owner based delays where the contractor failed to implement a construction schedule.

When RMC finally provided a schedule halfway through performance, it projected completion one month beyond the contractual completion date. While the May 23, 2018 date may have been ambitious, it did not excuse RMC's obligation to exercise reasonable diligence. "Failure of the contractor to furnish construction schedules and updates acceptable to the owner is itself a factor indicating lack of diligence." 7 BRUNER & O'CONNOR ON CONSTR. LAW § 18.24.

Heritage's June 1 notice made clear that the scheduling deficiencies were not nominal concerns:

> Although I have asked many times of the RMC staff for a schedule and Estimated Time of Arrival (ETA) dates for purchased materials, I have not been given such a schedule. Therefore, I don't know what RMC has ordered, its arrival date and how that fits into the schedule. . . . A revised construction schedule should be released with ETAs on all materials ordered. Particular attention should be paid to provide whatever support necessary to open as many rooms as possible as soon as possible.

ECF No. 17-40. Despite that notice, RMC did not provide a remedial schedule to restore Heritage's confidence in the completion of the project within a reasonable time prior to the termination date.

The failure to render a construction schedule was compounded by RMC's failure to comply with the contract's express percentage-based progress billing requirement. The T&M Contract provides: "Billings will be calculated monthly based on percentage of completion. Progressive payments are due upon receipt of monthly billing." ECF No. 17-1 at 1.

Throughout its performance, RMC submitted only one compliant invoice reflecting percentage completion. RMC's first invoice, issued in December 2017, was for a $800,000.00 down payment. ECF No. 36-2 at 14. RMC did not submit another pay application or invoice to Heritage for several months. ECF Nos. 36-2 at 15, 16. On March 30, 2018, Architect Landon requested RMC to submit its progress billing using

the AIA standard forms[4] so that percentage completion could be substantiated for the "lending institution." ECF No. 17-61 at 1. Within the construction industry, AIA forms are universally used to determine percentage completion with reference to a schedule of values. ECF No. 42 at 15. Architect Landon testified that projects "rarely" proceed without progress billing reflecting a schedule of values and that he cannot recall a project that "did not have a schedule of values that would reflect the overall value of the project." ECF No. 42 at 9, 10. Architect Landon needed a schedule of values to ascertain the percentage completion. ECF No. 42 at 47. On April 13, 2018, RMC submitted its pay application using the AIA form for work through March 31, 2018, reflecting 46 percent completion. ECF No. 15-17 at 3, 5. The pay application was reviewed by Architect Landon, who revised the amount due to $704,934.12. ECF No. 17-8. RMC sent an invoice on May 15, 2018, confirming the amount of $704,934.12 paid by Heritage. ECF No. 36-2 at 16. The invoice provides that "future invoices [were] to be billed per T&M and lump sum." ECF No. 36-2 at 16.

Subsequent invoices did not use the AIA format and did not reflect percentage completion. On June 26, 2018, RMC sent an invoice for work through April 30, 2018. ECF No. 13-16. The invoice was not prepared on a percentage of completion basis. Although there was no explicit requirement that AIA forms be used, RMC failed to provide the information in any format whatsoever. Instead, RMC billed by mirroring the Time and Materials billing format under the ESA for mitigation work. The invoice did not reflect a percentage completion or a schedule of values. In June 2018, RMC sent to Heritage its timely invoice for work through May 2018. ECF No. 13-17. It again did not reflect a percentage completion or schedule of values.

At trial, Pinder explained that RMC deviated from the AIA billing format because it was "unworkable" for this project and that he viewed

---

[4] AIA forms "are standardized contract documents developed by the American Institute of Architects (AIA)." AIA forms are widely used in the construction industry. *What are AIA Documents?* MASTT (June 18, 2024), https://www.mastt.com/glossary/aia-documents.

the billing language as "boilerplate."  ECF No. 48.  Pinder testified that he understood the T&M Contract to contemplate T&M based billing. ECF No. 48.   RMC's explanation is unavailing.  Whatever RMC's internal understanding was, the T&M Contract explicitly required monthly billing based on percentage of completion.  RMC drafted the contract.   It was not entitled to unilaterally disregard an express contractual term that it drafted.  If RMC determined the billing was "unworkable," it needed to request and obtain a modification or amendment, not ignore its obligation.

RMC's deviation from its own contract is inexcusable.  RMC understood that Heritage's insurer was paying a substantial portion of the reconstruction efforts and needed verification of progress.  RMC also understood Heritage needed percentage based billing for its lending institutions.

"An unexcused breach is material only if it reasonable compels a clear inference of unwillingness or inability of one party to meet substantially the contractual future performance expectations of the other party . . . ."  7 BRUNER & O'CONNOR CONSTR. LAW § 18.4.  Several factors weigh in favor of finding material breach.  Heritage was deprived of an organized progress toward reopening the hotel before peak season. The absence of a construction schedule for several months and the abandonment of the billing provision impaired Heritage's ability to evaluate progress.    The prospects of cure also diminished as performance progressed.   Heritage gave notice to RMC about its performance deficiencies.  Despite that notice, RMC did not provide an updated construction schedule and failed to comply with percentage based billing.

The Court finds that Heritage properly terminated RMC for cause.   Because Heritage's termination was proper, Heritage may recover the reasonable and necessary costs to complete the work, subject to offset for any unpaid contract balance.  *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012).

17 / 22

Heritage also argues that RMC breached the contract by improperly overbilling $1,261,600.00 in labor charges, contending that workers supplied by third parties should have been billed as "Specialty Subcontractors." ECF No. 24 at 1. The Court disagrees.

Like the ESA, the T&M Contract bills certain labor at hourly rates while "Specialty Subcontractors" are billed at actual cost plus mark up. ECF No. 17-12 at 6. The T&M Contract does not define "Specialty Subcontractors" nor does it provide criteria for distinguishing between the billing regimes. Most of the workers on the reconstruction project were supplied to RMC by third party laborers.

The Contract, however, does not condition the use of the hourly rate schedule on whether the worker is directly employed by RMC. The price identifies specific trades and assigns hourly rates to those categories (i.e. Carpenter, Flooring Installer, Electrician, Insulation Installer, Acoustic Ceiling Installer, Skilled Labor). ECF No. 13-7 at 6. Nothing in the contract limits those rates to RMC's direct employees.

The plain definition of the term "Specialty Subcontractors" does not resolve the uncertainty. Heritage refers to the statutory definition under California law: "a specialty contractor is a contractor whose operations involve the performance of construction work requiring special skill and whose principal contracting business involves the use of specialized building trades or crafts." CA BUS. & PROF. CODE § 7058 (2025). Several trades listed in the hourly rate schedule would fit into this definition.

Heritage's interpretation, that third-party laborers are specialty subcontractors, finds some support in the fact that RMC entered "Master Subcontract Agreement[s]" with certain labor suppliers. *See* ECF Nos. 18-20, 18-22.

RMC position, that "Specialty Subcontractor" refers to labor not listed on the T&M price schedule, also finds support. The phrase "Specialty Labor (not on T&M price list)" reflects that the parties understood the price list to control where applicable.

Considering that both parties' interpretations are reasonable, and that the contract was drafted by RMC, ambiguity is construed against the drafter as a last resort. But even under that principle, Heritage bears the burden of proving breach by RMC by a preponderance of the evidence.

Under principles of contract interpretation, specific provisions govern over the more general ones, provisions stated earlier in an agreement are favored over subsequent provisions, and the interpretation of an agreement should not render any material terms meaningless. *Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 462 (Tex. App.––Dallas 2007). The detailed price list enumerates categories of labor. The undefined "Specialty Subcontractor" provision is general. Where labor falls within a trade category, the specific hourly rate governs absent language to the contrary.

Heritage does not meet its burden to establish a breach of contract with respect to this billing issue. Excluding the billing issue from consideration as a breach, it is unambiguous that its other breaches were material, had severe consequences, and constituted cause for termination of the contract by Heritage.

## III.   DAMAGES CALCULATIONS

### A.   Mitigation Damages

For mitigation work governed by the ESA, RMC did not breach the contract. Heritage owes RMC $439,895.66. ECF No. 24.

### B.   Reconstruction Damages

Because Heritage properly terminated the T&M Contract, Heritage can recover the reasonable and necessary costs incurred to complete RMC's scope of the unfinished project, less the unpaid contract balance remaining under the contract. "The party seeking to recover the cost of completion in a breach of contract case has the burden to prove that the damages sought are reasonable." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 200 (Tex. 2004). "Evidence of

the amounts charged and paid, standing alone is no evidence that such payment was reasonable and necessary." *Id.*

Kate Hull Romero, expert witness for Heritage, prepared a completion cost report and testified that Heritage incurred reasonable and necessary completion costs in the amount of $2,673,786.00. ECF No. 29-1 at 10. RMC objects to certain invoices produced by Heritage on various grounds. [5] ECF No. 31. The Court generally overrules the objections but finds that the cost to repair spa heater in the amount of $47.50 falls outside the scope of the T&M Contract. ECF No. 29-33.

The Court summarizes the damage calculation for the T&M Contract as follows:

---

[5] The alleged out of scope cost invoices are ECF Nos. 29-48, 29-46, 29-43, 29-15, 29-17, 29-33, 29-36, 29-37 & 29-39. The cost invoices with allegedly insufficient detail are ECF Nos. 29-6, 29-11, 29-21, 29-25, 29-27, 29-32, 29-38, 29-41, 29-42, 29-44, and 29-50.

| Description | Amount |
|---|---|
| Adjusted T&M Contract Price[6] | $3,878,677.00 |
| Less: Amount Paid by Heritage[7] | ($1,679,531.12) |
| Less: Credit Given by RMC[8] | $84,178.48 |
| **Unpaid Contract Balance** | **$2,114,967.40** |
| | |
| Total third party billing to complete construction | $3,346,387.37 |
| Less: Spa heater repair[9] | ($47.50) |
| Less: Gonzales settlement[10] | ($420,748.99) |
| Less: Gonzales Work that exceeds scope of Adjusted T&M Contract Price | ($672,601.37) |
| **Actual Completion Cost Paid by Heritage** | **$2,252,989.51** |
| | |
| Less: Unpaid Contract Balance | ($2,114,967.40) |
| **Heritage's T&M Contract Damages** | **$138,022.11** |

[6] The T&M Contract price was not to exceed $4 million.  The adjusted contract price accounts for two approved change orders and a scope deduction.  ECF Nos. 49 at 2, 42 at 129.

[7] Heritage paid this amount for RMC's services prior to termination.  ECF No. 50-1 at 2.

[8] RMC issued a credit to Heritage on billed items.  ECF No. 16-40 at 8.

[9] The cost to repair a spa heater in the amount of $47.50 falls outside the scope of the T&M Contract and should not be included in Heritage's cost of completion for purposes of damages.  ECF No. 29-33.

[10] After Heritage terminated RMC, it retained Gonzales Building Group to complete the reconstruction of the hotel.  Gonzales billed $1,796,261.00.  ECF No. 29-21.  Heritage paid $1,123,659.63 and did not pay the remaining $672,601.37.  ECF No. 42 at 143.  Ms. Hull Romero incorporated the full $1,123,659.63 amount in Heritage's completion cost.  This amount is overstated.  The Record does not explain the reason for the $672,601.37 discount.  Ms. Hull Romero attributes the entire discount to Gonzales work performed outside of RMC's scope, but provides no reasoned basis for that conclusion.  ECF No. 42-144.  The Court instead allocates the Gonzales charges on a pro-rata basis and finds that $672,601.23 represents work outside RMC's scope, as Ms. Hull Romero testified, and $1,123,659.63 represents work within RMC's scope.  Applying a pro-rata allocation, 62.56% of $1,123,659.63—$702,910.64—is attributable to completion of RMC's contractual scope.  The remaining $420,748.99 is excluded from the completion cost.

Heritage is awarded $138,022.11 from the reconstruction dispute. RMC is denied its requested recovery of $1,621,320.10. ECF No. 49.

Heritage seeks reasonable attorney's fees in the amount of $815,003.21. ECF No. 50-1 at 2. The T&M Contract provides:

> In the event any legal action or other necessary actions are pursued in order to interpret or enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and any other costs thereby incurred.

ECF No. 17-2 at 4. Under the T&M Contract, Heritage properly terminated the contract and obtained net damages. Importantly, Heritage avoided payment of the requested $1,621,320.10. Heritage is the prevailing party. It is awarded its reasonable attorney's fees under the T&M Contract.

Heritage is required to present evidence in support of its reasonable attorneys' fees.

Heritage is not awarded any attorney's fees for work performed in connection with the mitigation dispute governed by the ESA, which does not provide for an attorney's fees clause. Heritage did not recover damages or prevail on its breach of contract claim for purposes of TEX. CIV. PRAC. & REM. CODE § 38.001. RMC sought no attorney's fees under the ESA.

## CONCLUSION

The hearing on attorney's fees and costs will be on March 30, 2026, at 9:00 a.m.

Signed: February 27, 2026

Marvin Isgur
United States Bankruptcy Judge